IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| COMMERCIAL RISK REINSURANCE COMPANY | ) ) ) |
| VS. | ) ) ) |
| TEXAS PROPERTY AND CASUALTY INSURANCE GUARANTY ASSOCIATION | ) ) ) |

CIVIL ACTION NO.
3-08-CV-2038-B

DEFENDANT TEXAS PROPERTY AND CASUALTY INSURANCE
GUARANTY ASSOCIATION'S REPLY TO PLAINTIFF'S RESPONSE TO
DEFENDANT'S MOTION TO DISMISS FOR
LACK OF SUBJECT MATTER JURISDICTION

TO THE HONORABLE JAYNE J. BOYLE, UNITED STATES DISTRICT JUDGE:

NOW COMES the Texas Property and Casualty Insurance Guaranty Association (the "TPCIGA"), and files this Reply to Commercial Risk Reinsurance Company's Response to Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), and in support thereof would respectfully show the Court as follows:

1.  <u>Commercial Risk's Response wholly fails to address its lack of standing to assert claims against TPCIGA under the Guaranty Act, or to assert claims on behalf of TIC United</u>.

Commercial Risk's Response makes it clear that its real objective in this litigation is obtain an advisory opinion amounting to an advance determination of TPCIGA's rights and obligations vis-à-vis TIC United, based on the assumption that certain contingent events occur. Clearly, Commercial Risk is not merely requesting a determination of the limitations of its own obligations:

> Commercial Risk's position is that TPCIGA is responsible for payment once the defense costs exceed $1 million. There is no guarantee that TPCIGA will pay its

share of the costs especially considering TPCIGA's reluctance to accept the fact that the amount of defense costs and of a case regarding an accident that resulted in the death of three people would exceed $1 million. TPCIGA's disagreement gives rise to potential litigation. Commercial Risk's Response, at 3.Plaintiff's Response makes it clear that the substantive claim it is asserting in this case is a contingent claim against TPCIGA under the Guaranty Act for a potential future breach by TPCIGA of what Commercial Risk believes are TPCIGA's defense obligations to TIC United under the Guaranty Act.

Even though Commercial Risk is effectively seeking a determination of TPCIGA's obligations under the Guaranty Act, its Response fails to furnish any factual or legal basis which would indicate Commercial Risk has standing to assert any claim against TPCIGA under the Guaranty Act, either on its own behalf or as a party purporting to assert TIC United's rights against TPCIGA by way of subrogation.[1] Commercial Risk is not a policyholder or third-party liability claimant with standing to present a "covered claim" to TPCIGA. Tex. Ins. Code art. 21.28-C, §5(8); Tex. Ins. Code §462.201.[2] To the contrary, Commercial Risk is an insurer or reinsurer whose claims are expressly excluded as covered claims payable by TPCIGA. Tex. Ins. Code art. 21.28-C, §5(8); Tex. Ins. Code §462.207. Therefore, Commercial Risk has no standing to assert claims against TPCIGA, whether on its own behalf or on behalf of TIC United.

---

[1] *Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765 (Tex. 2007) casts considerable doubt that Commercial Risk could have any rights by way of subrogation to assert a claim against TPCIGA, even if TPCIGA were an insurer and not a statutorily created entity whose enabling statute expressly precludes such claims against TPCIGA.

[2] Legislative amendments in 2005, which recodified the Guaranty Act to Chapter 462 of the Texas Insurance Code, became effective on April 1, 2007 with respect to insurers placed in liquidation proceedings in Texas. However, since the liquidation proceeding for Reliance Insurance Company was commenced and is pending in Pennsylvania, the version of the Guaranty Act applicable to claims under Reliance policies is the version in effect on October 5, 2001, when it was designated an impaired insurer. *Durish v. Channelview Bank*, 809 S.W.2d 273, 275 (Tex. App.—Austin 1991, writ denied); *Brodhead v. Dodgin*, 824 S.W.2d 616, 620 (Tex. App.—Austin 1991, writ denied); *Latter v. Autry*, 853 S.W.2d 836, fn. 1 (Tex. App.—Austin 1993, no writ); *Nunez v. Autry*, 884 S.W.2d 199 (Tex. App.—Austin 1994, no writ); *Webb v. Texas Property and Casualty Insurance Guaranty Association*, 2000 WL 147652 (Tex. App.—Austin 2000, no pet.)(not designated for publication). However, since Commercial Risk lacks standing to assert a claim against TPCIGA under any version of the Guaranty Act, the fact that the 2000 version of the Guaranty Act is applicable to claims under Reliance policies has no effect on the outcome of the issues presented by TPCIGA's Rule 12(b)(1) motion.

Commercial Risk complains in its Response that TPCIGA has failed to offer any guaranty that it will pay defense costs in the Chamberlain litigation. However, TPCIGA has no obligation under the Guaranty Act to make claim decisions based on speculation and assumptions about the occurrence of unknown and contingent future events, or to advise Commercial Risk about any such decisions. But even if Commercial Risk could show that TPCIGA owed a defense to TIC United in the Chamberlain litigation, Commercial Risk lacks standing to assert any claims against TPCIGA under the Guaranty Act.

Commercial Risk's Response also fails to furnish any factual or legal basis that Commercial Risk will incur any sort of harm should Commercial Risk exhaust its coverage and TPCIGA should fail to assume TIC United's defense in the Chamberlain litigation. If Commercial Risk is correct in its assertion that its payment of $1,000,000 will satisfy and discharge its contractual obligations with respect to the Chamberlain litigation, it could not be affected by any future adverse developments in the litigation. Therefore, Commercial Risk has failed to show that it could or will likely sustain any injury as the result of any future action or inaction on the part of TPCIGA. As a result, Commercial Risk lacks standing to assert claims against TPCIGA based on some hypothetical future harm to other parties, such as TIC United. Accordingly, dismissal of Commercial Risk's Complaint is mandated by *Florida Department of Insurance v. Chase Bank of Texas, N.A.*, 274 F.3d 924 (5th Cir. 2001).

2. <u>The evidence submitted by Commercial Risk with its Response *disproves* its contention that there is a substantial likelihood of imminent harm to Commercial Risk</u>.

Commercial Risk argues in its Response that it is likely to expend $1,000,000 in connection with the defense of the Chamberlain litigation. However, the

evidence submitted by Commercial Risk with its Response actually contradicts rather than supports this factual assertion. Specifically, Exhibit C to Plaintiff's Response shows that a total of $657,168.63 has been paid on this claim either as expense or under its bodily injury indemnity coverage obligations. The reserves shown on Exhibit C as "OPN RSV" are the amounts estimated by the management of Commercial Risk's claim department for its expected future out of pocket costs in the defense and settlement of this claim. Significantly, Commercial Risk's total reserves on this claim amount to $296,038.00 ($46,038 in expected future expenses, and $250,000 for expected future indemnity loss). *Therefore, Exhibit C is an admission by Commercial Risk that the total paid claims and reserves for the Chamberlain claim amount to $950,150—less than $1,000,000.*[3]

In the insurance business, reserves are an estimate of the future costs the insurer expects to pay to handle and pay the claim to conclusion. If Commercial Risk's management believed that its ultimate out of pocket costs in connection with the Chamberlain litigation and this litigation would equal or exceed $1,000,000, the total of the paid claims and reserves shown on Exhibit C would equal or exceed $1,000,000. Instead, the total of the paid claims and reserves on Exhibit C is less than $1,000,000.

Under standard insurance accounting practices, the reserves shown on Exhibit C are incorporated into its corporate financial accounting for all of the company's reserve liabilities. Therefore, the information indicating that Commercial Risk's ultimate out of

---

[3] Note that the paid amounts and reserves for expenses include costs paid and incurred by Commercial Risk in connection with litigation against TPCIGA. Such costs were not paid in connection with the defense of the underlying liability litigation against TIC United. Indeed, Commercial Risk concedes in its Response that $12,114.28 of the paid expenses shown on Exhibit C are unrelated to the defense of the Chamberlain litigation. It is unknown what amount of Commercial Risk's reserves for expenses relate to the expected future costs of defense of the Chamberlain litigation, and what amount relates to the expected future costs of this litigation.

pocket expenditures in connection with the Chamberlain claim will be less than $1,000,000 is contained in the statutory financial statements Commercial Risk has furnished to state insurance regulators, as well as in statements of its financial condition which are furnished to its own investors, its Board of Directors, and other stakeholders in its business operations. As a result, the assertions made by Commercial Risk in its Response to the effect that there is an imminent risk that Commercial Risk will pay $1,000,000 in defense and indemnity costs are directly contradicted by the reserve estimates contained in Commercial Risk's corporate financial disclosures.  Clearly, subject matter jurisdiction in this case cannot be based on a more pessimistic set of assumptions about Commercial Risk's expected future costs for the Chamberlain claim than the total of paid claims and reserves included in Commercial Risk's official corporate financial statements.

3. <u>Commercial Risk's Response and the evidence submitted with its Response proves that no actual controversy exists, since the conditions under which any actual controversy could arise are based on the occurrence of numerous contingent future events, which are far from certain to occur</u>.

Commercial Risk's Response strains to describe possible scenarios in which it may pay $1,000,000 in connection with the defense of the Chamberlain litigation. However, its assertions are impermissibly based on the unstated assumptions that ignore contingent future events which may turn out better than Commercial Risk anticipates (based on statements in its Response, not based on its reserves).  Among these unstated assumptions are that there is no realistic possibility that: 1) any of the motions contemplated within the March 2, 2009 litigation budget practice will dispose of some or all of the Plaintiffs claims in the underlying litigation, or will simplify the issues presented for determination at trial in a way that will shorten the amount of time required

for trial and trial preparation; or 2) after investing approximately $920,000 in defense costs, the result of the underlying litigation will be a take nothing judgment, either based on a defense verdict or based on the entry of a directed verdict or judgment notwithstanding the verdict.[4]

Commercial Risk's pessimistic assumptions are unfounded or at least far from certain. The claims of the plaintiffs in the underlying litigation involve an accident that occurred after the plaintiffs' vehicle sustained a malfunction which caused the vehicle to suddenly swerve into lanes of oncoming traffic, resulting in a collision with a TIC United truck which was on the side of the highway in which the TIC United vehicle had the right of way. These facts already create the substantial possibility of a favorable result in the underlying litigation. It is mere speculation to assume that Commercial Risk will be required to pay $1,000,000 or more to reach a favorable conclusion to the case. Based on the cases discussed in TPCIGA's Rule 12(b)(1) motion, subject matter jurisdiction in this case cannot rely upon assumptions that certain contingent events will necessarily occur, and this is clearly the case when those assumptions are based on nothing more than pessimistic speculation.

Even with Commercial Risk's pessimistic assumptions, and based on the most favorable interpretation of the evidence offered by Commercial Risk, there remains a gap between $1,000,000 and the total amount of paid defense costs and the amounts contained in the March 2, 2009 litigation budget. Commercial Risk's Response strains mightily to fill that gap with unsupported speculation about the amount of possible additional costs of appeal or settlement. However, Commercial Risk offers no factual

---

[4] Commercial Risk's pessimistic assumption that the payment of over $278,000 in defense costs will do nothing to reduce its exposure to the liability claims in the Chamberlain litigation or to simplify the issues presented at trial calls into question the reasonableness of incurring and paying those expenses.

support for its assumption that any party will appeal a judgment based on a jury verdict, let alone any credible prediction of the cost of a purely hypothetical future appeal. Instead, Commercial Risk speculates that amounts paid in connection with post-trial motions, appeal and future settlement negotiations "would certainly exceed the remaining $34,000" which it incorrectly calculates as the amount of the difference between the paid defense costs and the amount of the future costs contained in the March 2, 2009 litigation budget.[5] However it offers no factual basis to support that speculation.

Additionally, Commercial Risk's Response attempts to transform the absence of a "guarantee" by TPCIGA that it will start paying defense costs if and when Commercial Risk ceases to do so, into conduct on the part of TPCIGA that raises an imminent threat of impending legal action by TPCIGA against Commercial Risk. Commercial Risk concedes that TPCIGA has not made any threats of litigation against Commercial Risk. TPCIGA's unwillingness to make or to advise Commercial Risk of claim decisions in advance of factual developments that could make such decisions entirely unnecessary, or in the absence of any knowledge of future factual developments which might influence the outcome of the decision, cannot qualify as behavior that would afford any factual basis upon which Commercial Risk could reasonably anticipate litigation by TPCIGA.[6]

---

[5]  Commercial Risk's calculation incorrectly treats "incurred" expenses on Exhibit C as though they are limited to amounts charged as of February 26, 2009, when under customary insurance claim handling practices, an open reserve for expenses will include the expected future expenses of handling a claim to conclusion, not to an amount billed but not paid as of a specific date. Certainly Commercial Risk has never been billed for the $246,944 open bodily injury reserves shown on Exhibit C. Taking into account Commercial Risk's admission that $12,114.28 in paid expenses were not related to the defense of the Chamberlain litigation, the correct amount of the total amount of the paid expenses plus the amount of the March 2, 2009 litigation budget is $642,000 plus $278,000, or $920,000. Therefore, Commercial Risk's speculation about the future costs of post-trial motions, appeal, or settlement must explain why it is certain that Commercial Risk will pay future defense costs that will exhaust the $80,000 difference between $920,000 and $1,000,000, not a $34,000 difference.

[6]  Commercial Risk cites TPCIGA's reference to a *potential* future dispute about whether certain payments should properly be considered as defense costs as somehow evidencing the existence of an actual controversy. Ironically, Commercial Risk concedes in its Response that its claim records commingle

      4.    <u>Commercial Risk's Response impermissibly relies on events subsequent to its filing of this litigation as a basis for jurisdiction, when subject matter jurisdiction is determined on the basis of the facts that exist at the time the litigation is filed</u>.

      Commercial Risk's Response also impermissibly relies on evidence of facts and events that occurred subsequent to the date its Complaint was originally filed. In particular, Commercial Risk has attached documents relating to Commercial Risk's January 12, 2009 request that TPCIGA enter into a Consent Judgment (Exhibit A and B), a payment and reserve summary screen dated February 26, 2009 (Exhibit C), and a litigation budget that appears to been prepared shortly before March 2, 2009 (Exhibit D). However Commercial Risk filed its Complaint in December 2008. Subject matter jurisdiction is generally governed by the facts which exist at the time a complaint is filed. *Carney v. Resolution Trust Corp.*, 19 F.3d 950, 954 (5th Cir. 1994); *Honeywell Int'l, Inc. v. Phillips Petroleum Co.*, 415 F.3d 429, 431 (5th Cir. 2005). Since subject matter jurisdiction must exist as of the date Commercial Risk filed its Complaint, jurisdiction cannot be retroactively created by evidence of facts or communications that occurred subsequent to the date it filed this litigation.

      5.    <u>Commercial Risk's Response fails to identify any conceivable effect of the outcome of the Chamberlain litigation upon the TIC United bankruptcy estate</u>.

      Even if there was an actual controversy between TPCIGA and Commercial Risk, this Court would not have subject matter jurisdiction over this litigation under 28 U.S.C. §1334. Commercial Risk's Response asserts the TIC United bankruptcy estate will be

---

information about costs and expenses that are unrelated to the defense of the Chamberlain litigation with expenses that are defense-related. *See* Response, fn. 2. The concern TPCIGA was expressing in this comment was that Commercial Risk could conceivably have attempted to inaccurately characterize *all* of the expenses shown on Exhibit C as being defense-related, and as counting toward exhaustion of its $1,000,000 limit, when in fact some of those costs were not related to the defense of the Chamberlain litigation. However, TPCIGA's reference to a *potential* future argument about these calculations fails to satisfy the requirement that Commercial Risk provide evidence of conduct by TPCIGA indicating that litigation has been threatened or is imminent.

affected unless TPCIGA is compelled to make some sort of advance commitment to pay defense costs in the Chamberlain litigation if and when Commercial Risk ceases to do so:

> There is no guarantee that TPCIGA will start paying the obligation of the impaired insurer, Reliance Insurance Company. If Commercial Risk stops paying pursuant to its limits and TPCIGA does not pay, then no one will be paying on behalf of TIC. The estate of TIC will be affected, and TIC will not be able to do anything to protect itself. Commercial Risk's Response, at 5.

First, as discussed above, this statement is based entirely on Commercial Risk's unsupported and pessimistic assumptions about the occurrence and outcome of contingent future events which have not occurred and which may not occur; i.e.; that Commercial Risk will exhaust its coverage and that should that occur, TPCIGA will not step in to assume the defense of the Chamberlain litigation. Commercial Risk also fails to rule out the real possibility that a judgment based on a defense verdict will be entered in the Chamberlain litigation, and that this result could be obtained for an amount of defense costs less than $1,000,000.

Even more fatal to Commercial Risk's assertion that "related to" jurisdiction exists under 28 U.S.C. §1334 is the undisputed fact that an order signed on August 29, 2005 by the TIC United Bankruptcy Court disallowed and expunged the claims asserted against TIC United by the plaintiffs in the Chamberlain litigation. See Exhibit 1. Under the terms of the attached Order, the Chamberlain plaintiffs clearly cannot recover on their claim against the assets of the TIC United bankruptcy estate. Therefore, regardless of the outcome of the litigation, no assets of the TIC United bankruptcy estate will ever be paid to the Chamberlain plaintiffs. Commercial Risk's Response fails to explain how the TIC United bankruptcy estate could be harmed by an adverse judgment in the Chamberlain litigation, when a final order entered by Bankruptcy Court precludes any possible

recovery from the TIC United bankruptcy estate. Since the Chamberlain plaintiffs have no claim against the Bankruptcy estate, the only parties whose interests could be affected by the outcome of the Chamberlain litigation are TIC United's insurers and TPCIGA—not the TIC United bankruptcy estate. Therefore, even if there were an actual case or controversy between Commercial Risk and TPCIGA, no jurisdiction over this case exists under 28 U.S.C. §1334.

WHEREFORE, TPCIGA requests that the Court enter an order dismissing this case for lack of subject matter jurisdiction.

> Respectfully submitted,
>
> LAW OFFICE OF DANIEL JORDAN
> A Professional Corporation
> 4807 Spicewood Springs Road
> Building One, Suite 1220
> Austin, Texas 78759
> (512) 482-9400
> (512) 482-0515 FAX
> E-mail: dwj@danieljordanlaw.com
>
> By: /s/ Daniel Jordan
>     Daniel Jordan
>     State Bar No. 11006900
>
> Kirk P. Willis
> State Bar No. 21648500
> E-mail: willis@gsfpc.com
> Michael C. Lawrence
> State Bar No. 00784453
> E-mail: Lawrence@gsfpc.com
> GUIDA, SLAVICH & FLORES, P.C.
> 750 North St. Paul Street, Suite 200
> Dallas, Texas 75201
> (214) 692-0009
> (214) 692-6600 FAX
>
> ATTORNEYS FOR DEFENDANT
> TEXAS PROPERTY AND CASUALTY

                INSURANCE GUARANTY
                ASSOCIATION

CERTIFICATE OF SERVICE

       This certifies that a true and correct copy of the foregoing Reply to Plaintiff's Response to Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction has been delivered to Mr. James M. Garner, Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC, 909 Poydras St., Suite 2800, New Orleans, LA 70112, by ECF filing, in accordance with the Federal Rules of Civil Procedure, on this 13th day of April, 2009.

                                 /s/ Daniel Jordan
                                 Daniel Jordan